IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF ALAYNA N.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF ALAYNA N., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

WILLIAM P., APPELLANT.


Filed April 21, 2026.    No. A-25-466.


Appeal from the Separate Juvenile Court of Lancaster County: ROGER J. HEIDEMAN, Judge. Affirmed.

Steffanie J. Garner Kotik, of Kotik & McClure Law, for appellant.

Christopher M. Reid, Deputy Lancaster County Attorney, for appellee.


RIEDMANN, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

William P. appeals the termination of his parental rights to Alayna N. He assigns as error that the juvenile court erred in finding that terminating his parental rights was in Alayna's best interests. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

William and Destiny N. are the parents of Alayna, who was born in early December 2023. Destiny was only allowed to take Alayna home from the hospital after agreeing to a safety plan that prohibited Destiny from allowing William, who was incarcerated, to contact Alayna "unless

- 1 -

express permission [was] granted by DHHS." The safety plan was implemented because of statements made by Destiny that she was fearful of William.

On July 8, 2024, Alayna was removed from Destiny's home. Alayna, who was 7 months old, was placed in a relative's home together with her 5-year-old half-sister. The following day, the State filed a petition for adjudication alleging that Alayna was a child within the meaning of Neb. Rev. Stat. § 42-247(3)(a) (Cum. Supp. 2024) due to Destiny's fault or habits and/or that Alayna was in a situation dangerous to life or limb or injurious to her health or morals. Although genetic testing confirmed that William was Alayna's father in April 2024, there were no allegations against William in the petition for adjudication. On September 30, the juvenile court adjudicated Alayna as a child within the meaning of § 43-247(3)(a) based upon allegations against Destiny. There were no dispositional orders related to William except that DHHS "shall provide options counseling to [William] at [his] request."

Alayna remained in out-of-home placement throughout the pendency of this case, and William has remained incarcerated throughout Alayna's entire life.

## 2. MOTION TO TERMINATE PARENTAL RIGHTS/TERMINATION HEARING

On February 4, 2025, the State filed a motion for termination of parental rights regarding both Destiny and William. Destiny relinquished her parental rights and is not part of this appeal. The termination of parental rights, as it related to William, alleged the following grounds for termination: William had abandoned Alayna for 6 months or more immediately prior to the filing of the termination petition pursuant to Neb. Rev. Stat. § 43-292(1) (Reissue 2016); William had substantially and continuously or repeatedly neglected and refused to give Alayna necessary parental care and protection pursuant to § 43-292(2); William, being financially able, willfully neglected to provide Alayna with the necessary subsistence, education, or other care necessary for her health, morals, or welfare, or has neglected to pay for such subsistence, education, or care when legal custody of Alayna was lodged with others and such payments were ordered by the court pursuant to § 43-292(3); William subjected Alayna to aggravating circumstances, including but not limited to, abandonment pursuant to § 43-292(9); and that termination of William's parental rights was in Alayna's best interests. The State also alleged § 43-292(6), reasonable efforts to preserve and reunify the family, as a statutory basis for termination but later abandoned that allegation. On February 13, the juvenile court appointed counsel for William.

The termination hearing was held on May 22, 2025. Only two witnesses testified: Connie Nemec, the Department of Health and Human Services (DHHS) caseworker assigned to Alayna's case, and William.

### (a) Nemec's Testimony

Nemec testified that she had been the caseworker for Alayna since Alayna's birth in December 2023. Nemec acknowledged that Destiny was allowed to take Alayna home from the hospital because a safety plan was in place. That safety plan prevented Destiny from allowing William to have contact with Alayna. Although there were no court orders which otherwise prohibited William from having contact with Alayna, William never requested visitation or other contact with Alayna.

Nemec stated that she sent her first letter to William, who was incarcerated, in Spring 2024, shortly after genetic testing confirmed that William was Alayna's biological father. She sent William a second letter in July 2024, notifying him that Alayna had been removed from Destiny's home. William did not respond to either of the letters. Nemec testified that between July and November 2024, she sent one or two additional letters to William and she made unsuccessful attempts to contact William via phone or video call. Nemec's first successful contact with William via phone or video call was a video call with William that occurred in November 2024 during which Nemec provided introductory information and asked if William had any questions about Alayna's case and Alayna being in foster care. Nemec stated that William did not ask any questions during that conversation or other subsequent conversations. During the November 2024 call, William did not offer any financial support for Alayna and did not offer to provide any cards, gifts, or letters for Alayna.

According to Nemec, William had not provided any financial assistance for Alayna's care during this case. Additionally, William did not inquire as to how he could participate in the court case until after the State had filed the petition to terminate William's parental rights. According to Nemec, William never asked about having visits with Alayna, and if William had asked about having visits with Alayna, DHHS would have attempted to develop an appropriate plan for visits, taking into account Alayna's therapeutic needs and safety. Nemec testified that William had not done anything to assert his parental rights in this case and never tried to establish himself as Alayna's legal father despite genetic testing confirming that he was Alayna's biological father.

Nemec stated that DHHS offered options counseling to William and described that options counseling "provides an opportunity for a parent in a position such as [Destiny or William] to discuss the pros, cons, [and] emotional aspects of either relinquishment or termination [of parental rights] of a child." Nemec acknowledged that no other services were provided to William during this case.

Nemec testified that even if William was released from his incarceration in the near future, DHHS would not be able to recommend reunification of Alayna with him immediately upon his release because William

> has not met [Alayna and] . . . certainly there would be a time period where they would have to become acquainted. I do not know for certain [William's] experience with children other than the training he alluded to [the programming he completed] while incarcerated. He may need to be educated on how to parent, [including certain] developmental things as well.
>
> . . . I would also have some concerns not knowing [William's] personal history and his family experience . . . as is the case with families in this courtroom. Often times parents come with their own trauma history and that sometimes seeps into how they parent their child and it may not be healthy so there may need to be some work with [William] on any particular issues that . . . is in that vein from his prior relationships and any sort of substance use history if that exists or mental health history.

Nemec referenced William's past violent behavior and noted that DHHS would want that issue addressed to ensure that no violence occurred in Alayna's home, which was "one of the reasons that [DHHS] enforced the safety plan with the restrictions prohibiting [Destiny] from

having William around the children." Nemec also stated that DHHS would also want William to attend child-parent psychotherapy, to not engage in threatening or assaultive behavior, and to provide a safe and stable residence for Alayna before reunification could occur and that this would further delay permanency for Alayna.

Nemec further testified that based upon her training, education, and experience, she believed that Alayna needs permanency. Nemec stated that waiting would further delay permanency for Alayna and it is in Alayna's best interests to

> move towards a permanent placement at this stage in her life. She's young, she's established a bond with her foster parents. . . . She is very bonded to her [half-] sister. . . . I think [Alayna] would greatly benefit from continuing to establish that family relationship in one household.

According to Nemec, it is important in the first 24 months of a child's life to have an appropriate caregiver in order to "feel safe and connected in that relationship in order to develop healthy relationships moving forward in life." If a child does not have that proper bonding or attachment at those early ages, then "a child may start to act out and have other behaviors throughout life, . . . emotional or mental health difficulties, substance use, [and] things of that nature." Nemec testified that "children that languish in the foster care system often feel abandoned. They feel that they don't fit in with their peers that have stable home lives and experiences. It may lead to some other inappropriate relationships with peers and sometimes adults."

### (b) William's Testimony

William testified that he knew that Destiny was pregnant, that he was the father, and that he later became aware of Alayna's birth. He also admitted that he learned that Alayna had been removed from Destiny's care shortly after the removal. William acknowledged that he had never had any in-person or telephone contact with Alayna and that he had not sent any letters or cards to Alayna except for sending one Christmas gift in 2023. He admitted that he had not requested to have any sort of contact with Alayna because he "was waiting for the day in court to get everything figured out because I didn't know how else to go about it." However, he admitted that he never made an inquiry into how he could have a day in court, nor did he ask Nemec what he needed to do to initiate contact with Alayna. William stated that he did not ask for visitation with Alayna because it was his understanding that he was prohibited from having any contact with Alayna. William admitted that prior to the court's November 4, 2024, dispositional order, there was nothing that would have suggested to him that he could not have requested contact with Alayna and that he now understood that the November 4 dispositional order specifically pertained to Destiny not allowing him to contact Alayna.

William acknowledged or otherwise asserted that he had been receiving court orders and court reports throughout this case but stated that he did not understand that he had the right to an attorney; that Nemec never indicated that if he sent letters, she would give them to Alayna; that he was never provided any information governing his right to participate in hearings to request court-ordered contact; and that he was not provided any information about how he could participate in the case. He testified that he did not send any letters or gifts to Alayna or make any

- 4 -

efforts to have contact with Alayna because of the no contact orders. He stated that "I didn't wanna violate the court order and then ruin my chances of keeping my rights." William acknowledged that he was offered options counseling, but he declined to participate "[b]ecause I understood what was going on so there was really no reason to."

William stated that during his time in prison, he had taken advantage of programming involving anger management, parenting while incarcerated, violence reduction, and substance abuse. He learned that "if a kid's having a . . . temper tantrum or something, instead of losing your temper or punching [them] for it, sit [them] down and explain to [them] why it's not appropriate for them to do that." William testified that, if his parental rights were not terminated, he would rely on his sister to care for, and financially provide for, Alayna until he was released from prison.

At the time of Alayna's birth, William was serving an aggregate sentence of 4 to 5 years' imprisonment for robbery and terroristic threats convictions. He acknowledged that he had a previous parole revoked and that while serving his sentence, William was convicted of an assault occurring in State custody for which he received an additional sentence of 3 to 6 years' imprisonment ordered to run consecutively to his other sentences. He acknowledged that subsequent to Alayna's birth, he lost "a couple years" of good time due to the assault charge (which had occurred in State custody), his use of abusive language and gestures, and his disobeying an order. William testified that the earliest he could be released on parole was January 2027 and that his projected release date is in May 2033 at which time Alayna would be approximately 9½ years old. He also testified that he did not have a way to earn any income in prison until he was moved out of maximum-security housing. Finally, William acknowledged that he did not think that it was appropriate for Alayna to wait in foster care until he is released from prison.

### 3. COURT ORDER

On May 23, 2025, the juvenile court entered an order terminating William's parental rights to Alayna. The court found that the State proved by clear and convincing evidence that statutory grounds existed for termination pursuant to § 43-292(1) (abandonment), § 43-292(2) (substantial and continuous or repeated neglect), § 43-292(3) (willful neglect), and § 43-292(9) (aggravated circumstance including abandonment), and that termination of William's parental rights was in Alayna's best interests.

Regarding § 43-292(1), the court specifically held that William

testified he became aware he was alleged to be the father of [Alayna] in November 2023. William . . . submitted to genetic testing to determine paternity in April 2024. From the time of the filing of the Petition until the filing of the Motion for Termination of Parental Rights, William . . . received copies of all pleadings and court orders. At no time during this period from November 2023 to the filing of the Motion for Termination of Parental Rights did William . . . make any effort to become involved in the life of his child in any manner. The evidence adduced at trial shows William . . . has never had any contact with his child. The evidence clearly establishes William . . . abandoned [Alayna].

Regarding § 43-292(2), the court specifically found that the evidence adduced during the termination hearing showed that

- 5 -

William . . . has a lengthy criminal history of violent assaultive behavior leading to lengthy incarceration and removal from his child[.]

William . . . testified he may have the ability to provide a legal means of support and a safe and stable living environment for the child if he is released on parole in January 2027. A parent's failure to provide an environment to which his child can return can establish substantial, continual, and repeated neglect. The record clearly shows William . . . has failed to put himself in a position to parent his child by failing to address his criminal tendencies which has resulted in his incarceration and removal from his child's life.

Regarding § 43-292(3), the court specifically found that the evidence adduced during the termination hearing showed "that William . . . believed he may have a job waiting for him when he is released from incarceration, but no means to provide any subsistence, education, or other necessary care for the child until then."

Regarding § 43-292(9), the court specifically held:

As noted previously, William . . . became aware he was alleged to be the father of [Alayna] in November 2023. William . . . submitted to genetic testing to determine paternity in April 2024. From the time of the filing of the petition until the filing of the Motion for Termination of Parental Rights, William . . . received copies of all pleadings and court orders. At no time during this period from November 2023 to the filing of the Motion for Termination of Parental Rights did William . . . make any effort to become involved in the life of his child in any manner. The evidence adduced at trial shows William . . . has never had any contact with his child. The evidence clearly establishes William . . . subjected [Alayna] to aggravated circumstances; namely, abandonment.

Regarding best interests of the child, the juvenile court found that the evidence clearly indicated that Alayna had a safe, secure and stable environment in her current placement and that William cannot provide a safe, secure, and stable environment at the current time or at any time in the reasonably foreseeable future. The court noted that William's own estimation of a best case scenario was that he would be released on parole in January 2027, but "he had a prior parole revoked, acquired additional sentences for a violent felony assault, and lost considerable 'good time' for prison infractions," which also resulted in his placement in the maximum segregation unit. The totality of those facts makes it [more] likely [that William will be released in May 2033]." Further the court noted that "[s]ubstantial work would need to occur" before Alayna could be reunited with William.

The court also found that the State had rebutted the presumption that William was a fit parent. The court noted:

It is clear William . . . has a history of violent, assaultive behavior dating back to his teens. There is little indication William . . . has addressed these substantial issues. When asked what he learned from his parenting class in prison, he offered that if a child was engaged in a temper tantrum it was better to "not lose your temper or punch them for it." . . . When,

and if, William . . . may have a willingness to provide for the basic care and support of [Alayna] is unknown.

William has appealed the termination of his parental rights.

## III. ASSIGNMENT OF ERROR

William's sole assignment of error is that the juvenile court erred in finding that the termination of his parental rights was in the minor child's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024). When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

## V. ANALYSIS

William's sole assignment of error is that the juvenile court erred in finding that termination of his parental rights was in Alayna's best interests. Specifically, he argues:

> In the case at hand, it is clear that it is in the best interests of the child for them to continue with a parent child relationship with William . . . It is clear that William had not had contact with the child since her birth, however, he was not afforded the ability to attempt to rehabilitate. He was not provided ANY efforts to correct any adjudicated issues. He was not even provided an attorney to attempt to get visits or other services ordered for him.

Brief for appellant at 13-14. William did not assign error to the juvenile court's finding that statutory grounds for termination existed pursuant to § 43-292(1) (abandonment), § 43-292(2) (substantial and continuous or repeated neglect), § 43-292(3) (willful neglect), and § 43-292(9) (aggravated circumstance including abandonment).

### 1. STATUTORY BASIS FOR TERMINATION

Although William does not separately assign error to the court's findings that various statutory bases existed to justify termination, because our review is de novo, we briefly address this requirement before considering William's specific assignment of error.

The grounds for terminating parental rights are codified in § 43-292. Any of the 11 separate subsections of § 43-292 can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Denzel D., supra*. The State has the burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *Id*.

As relevant to this appeal, one of the statutory bases the juvenile court found to exist was § 43-292(1). That section requires proof "[t]he parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition." "Abandonment," for the purpose of

§ 43-292(1), is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child. *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990). The question of abandonment is largely one of intent to be determined in each case from all of the facts and circumstances. *In re Interest of A.G.G.*, 230 Neb. 707, 433 N.W.2d 185 (1988).

As to the evidence proffered by the State in support of this basis for termination, the juvenile court held that William

> testified he became aware he was alleged to be the father of the child in November 2023. William . . . submitted to genetic testing to determine paternity in April 2024. From the time of the filing of the Petition until the filing of the Motion for Termination of Parental Rights, William . . . received copies of all pleadings and court orders. At no time during this period from November 2023 to the filing of the Motion for Termination of Parental Rights did William . . . make any effort to become involved in the life of his child in any manner. The evidence adduced at trial shows William . . . has never had any contact with his child. The evidence clearly establishes William . . . abandoned the child.

We agree.

The evidence adduced at trial indicates that William never had any contact with Alayna, nor made any effort to do so, prior to the filing of the petition to terminate, despite acknowledging that he believed he was Alayna's father when he learned Destiny was pregnant and genetic testing confirmed his paternity in April 2024. Nor did he make any effort to become involved in Alayna's life or assist or care for her in any way. And although we recognize William's incarceration hampered his ability to provide for Alayna, here he made absolutely no attempt to contact or provide for Alayna in any way before the termination petition was filed. On this record, we find by clear and convincing evidence that William abandoned his child. And because only one statutory ground need be proved in order for parental rights to be terminated, we proceed to the best interests determination, which was the only error assigned and argued by William. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019) (if appellate court determines that lower court correctly found termination of parental rights is appropriate under one of statutory grounds set forth in § 43-292, appellate court need not further address sufficiency of evidence to support termination under any other statutory ground).

## 2. BEST INTERESTS

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. § 43-292. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly used in § 43-292, the concept is generally encompassed by the fault and neglect subsections of that statute and is also embedded in a determination of the child's

best interests, which is under consideration in this appeal. *In re Interest of Noah C., supra*. We have defined parental unfitness as "a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being." *Id.* Analysis of the minor child's best interests and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

Here, William has been incarcerated during Alayna's entire life. Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). And we have noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id*. Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id*. William acknowledged that he previously had his parole revoked and, after Alayna's birth, he lost "a couple years" of good time due to an assault charge, use of "abusive languages and gestures," and disobeying an order, which extended his imprisonment to, at the earliest, January 2027, and more likely, May 2033. And even when William is released from imprisonment, DHHS would not be able to recommend reunification immediately upon release which would further delay permanency for Alayna. William acknowledged that he did not think that it was appropriate for Alayna to wait in foster care until he is released from prison.

And although William was aware that Destiny was pregnant, that he was the alleged father, and was later informed of Alayna's birth in December 2023, he had never had in-person, telephone, or video contact with her. He had not provided any financial support for Alayna and had provided no cards, letters, or gifts for her except for a Christmas gift in 2023 shortly after Alayna's birth. He had not attempted to establish himself as Alayna's legal father other than initiating genetic testing and he had never requested visitation with Alayna.

In response to William's argument that the State made no reasonable efforts to preserve and reunify him with Alayna, reasonable efforts to preserve and reunify the family are not required if a court of competent jurisdiction has determined that the parent of the juvenile has subjected the juvenile or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse. Neb. Rev. Stat. § 42-283.01(4)(a) (Cum. Supp. 2024). Further, the statutory provision that requires reasonable efforts to reunify families is incorporated into only one of the subsections of the juvenile code that set forth the grounds for termination of parental rights, not into the remaining subsections. *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Accordingly, no reasonable efforts were required in this case.

William's failure to establish himself as Alayna's father, his failure to provide financial support to Alayna, his failure to request visitation, his total lack of contact with Alayna during her entire life, and his choices which led to the revocation of his probation and extended his incarceration all establish his unfitness as a parent. Alayna established a bond with her foster parents and her half-sister and deserves permanency. William cannot provide permanency now or in the near future. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d

376 (2024). We conclude that the State established clear and convincing evidence that William was unfit and that termination of his parental rights was in Alayna's best interests.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating William's parental rights to Alayna.

AFFIRMED.